## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SHULI LI, | |
| Plaintiff, | CIVIL ACTION NO. 3:21-CV-00868 |
| v. | (MEHALCHICK, M.J.) |
| UNIVERSITY OF SCRANTON, | |
| Defendant. | |

### MEMORANDUM

Presently before the Court is a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) brought by Defendant University of Scranton (the "University") in the instant insurance coverage case. (Doc. 8). Plaintiff Shuli Li ("Li") filed the complaint against the University on March 12, 2021. (Doc. 1). For the following reasons, the motion shall be granted in part and denied in part. (Doc. 8).

## I.   BACKGROUND AND PROCEDURAL HISTORY

On May 11, 2019, Li, then a 22-year-old student at the University of Scranton, engaged in sexual intercourse with a 14-year-old female minor ("Ms. Roe"). (Doc. 1, at ¶ 7, 13). After police officers of Rice Township, Pennsylvania, discovered Li and Ms. Roe in a car, Li was arrested for statutory sexual assault as a felony of the second degree and corruption of a minor as a felony in the third degree. (Doc. 2-5, at 1). Both Li and Ms. Roe admitted to the police that they had engaged in sexual intercourse and Li admitted that he knew the girl's age at the time of the incident. (Doc. 2-5, at 1).

On May 12, 2019, the University became aware that criminal charges had been filed against Li, charging him with statutory sexual assault and corruption of a minor. (Doc. 2-5,

at 1). On May 13, 2019, the University notified Li that he was being placed on an interim suspension from the University effective immediately. (Doc. 1, at ¶ 17). The notice stated that the action "is the direct result of the criminal charges filed against [him] on May 11, 2019 that charge [him] with statutory sexual assault and corruption of minors." (Doc. 1, at ¶ 17; Doc. 2, at 1). The notice also informed Li that his alleged actions may be in violation of the University's Sexual Harassment and Sexual Misconduct Policy (the "Policy") and "several standards found in the Student Code of Conduct," including "[c]onduct that is disorderly, lewd, or indecent."(Doc. 2, at 1-2).

On May 15, 2019, Li received an email from the University's Title IX Coordinator and Executive Director of the Office of Equity and Diversity, Elisabeth M. Garcia, informing the University was "proceeding to the formal Investigation and Determination process outlined in the Sexual Harassment & Sexual Misconduct Policy." (Doc. 2-2, at 1). The email notified Li that the investigator would be reviewing the events and circumstances that came to the University's attention through the initial complaint filed against Li and additional information provided during the investigation process. (Doc. 2-2, at 1).

On September 19, 2019, the investigator assigned to the case, Maureen P. Holland (the "Investigator"), determined that "it is more likely than not that [Li] engaged in sexual intercourse with a minor who was unable to give effective consent due to her age." (Doc. 2-5, at 2). The Investigator recommended that "[Li] be found *responsible* for Sexual Assault as defined by the Policy, and *not responsible* for Sexual Exploitation." (Doc. 2-5, at 2) (emphasis in original). The Investigator based the findings and recommendation on police reports of the incident and Li's waiver of a preliminary hearing on the charges filed against him. (Doc. 2-5, at 2). On September 24, 2019, a Determination Panel convened and concurred with the

2

Investigator's findings, based upon a preponderance of the evidence standard. (Doc. 2-5, at 2-3).

On October 15, 2019, Li appealed the decision of the Determination Panel. (Doc. 2-6, at 1). Li argued that the off-campus incident did not involve a university student, program, or activity, and that the Panel's decision "represents a deviation from published University policy and procedures that materially affects the outcome." (Doc. 2-6, at 1). Further, Li argued that "the decision is at odds with Title IX regulations and interpretative guidelines," and that the University lacked jurisdiction to sanction him under the Policy because the incident occurred off-campus. (Doc. 2-6, at 1-2). Lastly, Li argued that the University "breached its contract" with Li. (Doc. 2-6, at 2). On October 18, 2019, the University denied Li's appeal "for failure to fit within the three areas designated for appeal under the University's policy." (Doc. 2-7, at 1).

On March 12, 2021, Li initiated this action by filing the complaint against the University pursuant to Title IX of the Education Act Amendments of 1972, 20 U.S.C. § 1681, *et seq*. (Doc. 1, at 3). In the complaint, Li asserts claims for breach of contract and gender discrimination violation of Title IX of the Education Amendments of 1972. (Doc. 14-18). As relief, Li seeks declaratory judgment, injunctive relief, attorney's fees where applicable, and compensatory damages. (Doc. 1, at 19).

On July 12, 2021, the University filed the motion to dismiss for failure to state a claim upon which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 8). The motion is fully briefed and ripe for review. (Doc. 9; Doc. 10; Doc. 11).

A. UNIVERSITY POLICIES AND PROCEDURES

The University issues a Student Handbook (the "Handbook"), which sets forth the

standards of conduct expected of members of the University's community, as well as policies and procedures for investigating and adjudicating complaints made by members of the University's community. (Doc. 2-3, at 1-111). The Handbook states: "The University has two codes of behavior; one for academic behavior (this document) and one for social behavior (Student Code of Conduct) . . . [t]he latter deals with matters outside the context of academic courses." (Doc. 2-3, at 31). The Handbook states that "[a]ll forms of sexual harassment and sexual misconduct, including sexual assault, sexual exploitation, intimate partner violence and stalking are governed by and adjudicated through the Sexual Harassment and Sexual Misconduct Policy." (Doc. 2-3, at 46). The Handbook's Off-Campus Behavior Policy states that "[t]he University's jurisdiction in disciplinary matters extends to any conduct that adversely affects the University community, the University's reputation and/or pursuit of its mission and objectives regardless of where it occurs." (Doc. 2-3, at 47). Further, the Off-Campus Behavior Policy states that "the University reserved the right to refer students involved in the aforementioned behaviors, as well as other disruptive behaviors, to the Office of Student Conduct for disciplinary action." (Doc. 2-3, at 47).

The University's Student Code of Conduct states that "[s]tudents who engage in behavior that is not aligned with the University's standards as set forth in the Student Code of Conduct are subject to University disciplinary action." (Doc. 2-3, at 60). The Student Code of Conduct lists prohibited conduct, including "[c]onduct that is disorderly, lewd, or indecent; reckless behavior that places oneself or others at risk; breach of the peace; or aiding, abetting, or procuring another person to breach the peace." (Doc. 2-3, at 61). Sanctions available to the University for violations of the Student Code of Conduct include expulsion and withholding of degree. (Doc. 2-3, at 70).

The University's Policy "applies to conduct that takes place while on University property, at University sponsored events and activities, and off-campus programs," as well as "off campus activity that violates the policy and has the effect of interfering with or limiting one's ability to participate in or benefit from a work-related or educational program or activity." (Doc. 2-3, at 59). The Policy states that "[a]ll students and employees of the University are responsible for their actions and behavior, whether the conduct in question occurs on campus or in another location," which includes "off-campus conduct that has continuing adverse effects on campus, in the context of an education program or activity, or where the conduct has the potential to adversely affect any member of the University of Scranton community." (Doc. 2-4, at 8).

"Each resolution process is guided by the law and/or principles of fairness and respect for all parties. Any individual who violates these standards will be held accountable for their behavior…." (Doc. 2-4, at 27). The University's response to an allegation of misconduct "is pursued in multiple stages: report, formal written complaint, notice, investigation, formal or informal grievance process, and appeal." (Doc. 2-4, at 27). Where there no formal complaint filed, the Title IX Coordinator may still proceed under the Policy's definitions and/or jurisdiction and assess whether the conduct, "if proven, constitutes a possible violation of the University Sexual Misconduct definitions." (Doc. 2-4, at 39). The investigation must proceed "with the presumption that the Respondent is not responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion of the grievance process." (Doc. 2-4, at 42). After the investigation is completed, a decision-making panel "will deliberate and determine whether the Respondent is responsible or not for some or all of the alleged policy violations by applying the clear and convincing standard," which means that

"the evidence is highly and substantially more likely to be true than untrue." (Doc. 2-4, at 50-51). The decision-making panel "may impose any sanction or remedy deemed appropriate after consideration of all of the relevant information." (Doc. 2-4, at 58). "A student found responsible for sexual harassment and/or misconduct will face a minimum sanction of disciplinary probation up to and including expulsion." (Doc. 2-4, at 59).

A respondent may appeal a determination of responsibility within five business days from the date of notification of the decision. (Doc. 2-4, at 53). The limited grounds for appeal include new evidence that could affect the outcome of the matter, a procedural irregularity that affected the outcome of the matter, or an allegation that an individual involved in the grievance process had a conflict of interest or bias against the respondent. (Doc. 2-4, at 53).

## II.   RULE 12(B)(6) MOTION TO DISMISS STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a defendant to move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "Under Rule 12(b)(6), a motion to dismiss may be granted only if, accepting all well-pleaded allegations in the complaint are true and viewing them in the light most favorable to the plaintiff, a court finds the plaintiff's claims lack facial plausibility." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). Although a court must accept the factual allegations in a complaint as true, it is not compelled to accept "unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007)). Additionally, a court need not assume that a plaintiff can prove facts that the plaintiff has not alleged. *Associated Gen. Contractors of Cal. v. California State Council of Carpenters*, 459 U.S. 519, 526 (1983).

In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the United States Supreme Court held that, when considering a motion to dismiss, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. In evaluating a motion to dismiss, a court may consider the facts alleged on the face of the complaint, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

III.    **DISCUSSION**

In the motion to dismiss, the University argues that the complaint fails to state a plausible claim. (Doc. 9, at 5). First, the University avers that Li fails to articulate a breach of contract claim because Li does not identify a material term of the University's published policies that was breached and Li does not establish that damages resulted from the alleged breach. (Doc. 9, at 11). Second, the University asserts that Li's conclusory allegations fail to sufficiently state a claim for gender discrimination under Title IX. (Doc. 9, at 20). In response, Li contends that the complaint sufficiently pleads that "the University breached its contract with him by breaking its explicit jurisdictional limitation policy promise," that "the University breached its 'fairness' promise by refusing to apply this policy to Li's prosecution and because it refused to provide a venue for him to assert the objection and have it evaluated," and that this breach resulted in damages."  (Doc. 10, at 14).

7

A. Breach of Contract

Under Pennsylvania law, "three elements are necessary to plead a cause of action for breach of contract: (1) the existence of a contract, including its essential terms; a breach of the contract; and (3) resultant damages." *Doe v. Univ. of Scis.*, 961 F.3d 203, 210 (3d Cir. 2020) (citing *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016)). The "relationship between a private educational institution and an enrolled student is contractual in nature." *Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. Ct. 1999). The contract between a student and a university is "is comprised of the written guidelines, policies, and procedures as contained in the written materials distributed to the student over the course of their enrollment in the institution." *Swartley*, 734 A.2d at 919. Courts review the agreement between a student and a private university "as [they] would any other agreement between two private parties." *Reardon v. Allegheny Coll.*, 926 A.2d 477, 480 (Pa. Super. Ct. 2007) (citing *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 428 (Pa. 2001)). Consequently, a breach of contract claim against a private university "must relate to a specific and identifiable promise that the school failed to honor." *Vurimindi v. Fuqua Sch. of Bus.*, 435 F. App'x 129, 133 (3d Cir. 2011). Here, the complaint states a plausible breach of contract claim.

The complaint submits that the University and Li established a contractual relationship when Li paid tuition and the University agreed to provide him access to its undergraduate degree program. (Doc. 1, at 14). Li claims that the enrollment into and attendance of classes created a reasonable expectation that he would earn his degree, provided that he fulfilled the academic requirements and remained in good standing. (Doc. 1, at 14-15). Li states that when he accepted the University's Handbook and Policy, the contractual

obligation was established. (Doc. 1, at 15). The complaint asserts that the University breached its published procedures when it subjected Li to a "campus disciplinary process for which it has no jurisdiction under its own policies." (Doc. 1, at 15). Further, the complaint contends that the University's disciplinary process was arbitrary, capricious, and contravened its own policies and procedures, denying Li his right to basic fairness and damaging Li's future. (Doc. 1, at 16). Li asserts that, as a direct and proximate result of these breaches, he suffered and will continue to suffer damages in the form of loss of professional opportunity and loss of tuition. (Doc. 1, at 16).

The University requests that this breach of contract claim be dismissed, arguing that the Policy clearly applied Li's misconduct and that the University properly adjudicated Li's misconduct under the procedures set forth in the Policy. (Doc. 11, at 3). The University asserts that the "fairness" due to all parties is set forth in the procedures of the Handbook and the Policy. (Doc. 9, at 15). In ascertaining the duties that a contract imposes and whether they have been breached, the court must first interpret the terms of the contract. "The paramount goal of contract interpretation is to determine the intent of the parties." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009) (quotation omitted). "The strongest objective manifestation of intent is the language of the contract." *Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 76 (3d Cir. 2011) (citations omitted). "When the words of a contract are clear and unambiguous, the intent of the parties must be ascertained from the language employed in the contract, which shall be given its commonly accepted and plain meaning." *TruServ Corp. v. Morgan's Tool & Supply Co.*, 39 A.3d 253, 260 (Pa. 2012) (citing *LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 647 (Pa. 2009)). Moreover, "[t]he whole instrument must be taken together in arriving at contractual intent." *Murphy*, 777 A.2d at 429 (citation

omitted). "The meaning of an unambiguous written instrument presents a question of law for resolution by the court." *Murphy*, 777 A.2d at 430 (citing *Cmty. Coll. v. Cmty.* Coll., Soc'y of the Faculty, 375 A.2d 1267, 1275 (Pa. 1977)).

According to the University Handbook, "[a]ll forms of sexual harassment and sexual misconduct, including sexual assault, sexual exploitation, intimate partner violence and stalking are governed by and adjudicated through the Sexual Harassment and Sexual Misconduct Policy." (Doc. 2-3, at 46). The Handbook's Off-Campus Behavior Policy states that "[t]he University's jurisdiction in disciplinary matters extends to any conduct that adversely affects the University community, the University's reputation and/or pursuit of its mission and objectives regardless of where it occurs." (Doc. 2-3, at 47). Under the Policy, "[a]ll students and employees of the University are responsible for their actions and behavior, whether the conduct in question occurs on campus or in another location," which includes "off-campus conduct that has continuing adverse effects on campus, in the context of an education program or activity, or where the conduct has the potential to adversely affect any member of the University of Scranton community." (Doc. 2-4, at 8). The University's response to an allegation of misconduct "is pursued in multiple stages: report, formal written complaint, notice, investigation, formal or informal grievance process, and appeal." (Doc. 2-4, at 27). Where there no formal complaint filed, the Title IX Coordinator may still proceed under the Policy definitions and/or jurisdiction and assess whether the conduct, "if proven, constitutes a possible violation of the University Sexual Misconduct definitions." (Doc. 2-4, at 39). The University contends that "[e]ach resolution process is guided by the law and/or principles of fairness and respect for all parties." (Doc. 2-4, at 27).

Nowhere in either the Handbook or the Policy is fairness defined, let alone explicitly

defined as the procedural protections contained in the Handbook and the Policy. Thus, the Court must construe the "fairness" promise as a matter of contract interpretation. *See Univ. of Scis.*, 961 F.3d at 212. "When interpreting a contract, the court's paramount goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement." *Halpin v. LaSalle Univ.*, 639 A.2d 37, 39 (Pa. Super. Ct. 1994) (citations omitted). In *Boehm v. Univ. of Pa. Sch. of Veterinary Med.*, the court held that the private university's disciplinary proceedings were "fundamentally fair" because the procedures included (1) giving notice of charges to the accused students; (2) presenting the accused students with the evidence against them; (3) allowing the accused students to be present for and to participate in a live hearing; (4) permitting the accused students to be assisted by a faculty adviser during the hearing; (5) allowing the cross-examination of witnesses; and (6) permitting the accused students to call their own witnesses. 573 A.2d 575, 582 (Pa. Super. Ct. 1990). And in *Reardon v. Allegheny Coll.*, the court found that a private university provided the accused with a fair process by "provid[ing] for minimum procedural safeguards—notice, the admission of relevant testimony, the right to call witnesses and present evidence, and the right to be represented by a member of the college community." 926 A.2d 477, 482 (Pa. Super. Ct. 2007).

The complaint asserts a breach of contract claim by arguing that "the University's disciplinary process and decision contravened its own policies and procedures, denied him his right to basic fairness, and deprived him of his University of Scranton degree, jeopardizing his future and livelihood, and has caused him significant emotional distress and economic harm." (Doc. 1, at 2). To be sure, after the school received notice that criminal misconduct charges were filed against Li, he received a Notice of Interim Suspension and letter from the

Investigator, requesting that Li meet with her to discuss the status of the University's investigation. (Doc. 2, at 1; Doc. 2-1, at 1). Basic fairness in sexual misconduct investigations requires that students accused of sexual misconduct receive promised procedural protections, including notice, presentation of evidence, and a live hearing. *See Boehm,* 573 A.2d at 582. The complaint suggests that the University did not provide Li with proper notice, a fair investigation, a live hearing with the presentation of evidence and cross-examination of witnesses, or a proper method of appealing the Determination Panel's conclusion. (Doc. 1, at 15-16). Thus, Li states a plausible claim that the University's investigation of Li's sexual misconduct allegations failed to adhere to its Handbook and Policy procedures and violated the fairness that the University promises students accused of sexual misconduct.

Lastly, in the motion to dismiss, the University argues that even if the Court finds that Li states a plausible breach of contract claim, the claim must still be dismissed because no damages resulted from the alleged breach. (Doc. 9, at 16). Li asserts that the complaint plausibly connected the breach to his resultant damages. (Doc. 10, at 14). To state a breach of contract claim, a plaintiff must sufficiently allege resultant damages. *Univ. of Scis.*, 961 F.3d at 210. The complaint avers that Li "suffered as a result of the University's Title IX based decision to expel him and refuse to confer his undergraduate degree to him, despite having paid in excess of $150,000 in tuition and completing all of the requirements for doing so." (Doc. 1, at 1). Further, the complaint states that the alleged breach jeopardized his future livelihood and caused him significant emotional distress and economic harm. (Doc. 1, at 2). Li asserts that "[a]s a direct and proximate result of these breaches, [Li] has suffered and will continue to suffer significant harm in the form of the loss of professional opportunity and the loss of the tuition monies paid to the University." (Doc. 1, at 16).

Under these circumstances, it is premature to conclude that any investigative breaches and final adjudication did not cause any damage to Li. Accordingly, the Court denies the University's motion to dismiss the breach of contract claim insofar as the claim is grounded on the University's failure to provide Li with adequate notice, a fair investigation, a live hearing with the presentation of evidence and cross-examination of witnesses, or a proper method of appealing the Determination Panel's conclusion. (Doc. 1, at 15-16).

B. TITLE IX GENDER DISCRIMINATION

In the complaint, Li also brings a gender discrimination in violation of Title IX of the Education Amendments of 1972 claim. (Doc. 1, at 16). Li asserts that the Title IX policy put in place by the University deprived him, on the basis of sex, of his rights to due process and equal protection in its adjudication. (Doc. 1, at 16). Li avers that the University's policies "disproportionally affect the male population" and "effectuate a denial of basic fairness for the male student population, because they are set up to encourage and facilitate false reports of sexual misconduct and/or other grievances without any recourse for the falsely accused." (Doc. 1, at 17). In the motion to dismiss, the University argues that Li's claim fails to offer factual allegations beyond a general statement that there is a higher incidence of female complainants of sexual misconduct as compared to male complainants and the University's decision to discipline him under the Title IX Policy." (Doc. 9, at 22).

"Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). Title IX provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

"Because Title IX prohibits (under covered circumstances) subjecting a person to discrimination on account of sex, it is understood to bar the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Doe*, 831 F.3d at 53 (internal quotation marks omitted). To state a claim under Title IX, the alleged facts must support a plausible inference that the school discriminated against the plaintiff on the basis of sex. *Univ. of Scis.*, 961 F.3d at 209.

The University argues that the complaint fails to plausibly allege that the University discriminated against Li on the basis that he is a man. (Doc. 9, at 22). Li asserts that the University violated his constitutional rights and its own policies. (Doc. 1, at 1). However, the Court finds that the complaint lacks specific, non-conclusory allegation supporting an inference that the University's treatment of him was related to his male sex.

In the complaint, Li makes several allegations in support of his Title IX claim. First, Li asserts that the University "ignored the jurisdictional constraints of its own policies" to punish Li for an alleged incident that occurred off-campus. (Doc. 1, at 17). The University's Policy "applies to conduct that takes place while on University property, at University sponsored events and activities, and off-campus programs," as well as "off campus activity that violates the policy and has the effect of interfering with or limiting one's ability to participate in or benefit from a work-related or educational program or activity." (Doc. 2-3, at 59). The Policy states that "[a]ll students and employees of the University are responsible for their actions and behavior, whether the conduct in question occurs on campus or in another location," which includes "off-campus conduct that has continuing adverse effects on campus, in the context of an education program or activity, or where the conduct has the

14

potential to adversely affect any member of the University of Scranton community." (Doc. 2-4, at 8). In the complaint, Li cites no authority in support of his proposition that Title XI prohibits the University from enacting a policy that covers off-campus assaults where the complainant is not a student. Regardless, the Title IX claim rests upon the issue of whether the University discriminated against Li on the basis of his sex.

Li argues that the University "conducted its investigation of the allegations against [Li] in a manner that was slanted in favor of the female accusers so much so that an actual complaint was not needed in the process." (Doc. 1, at 17). Further, Li submits that the University's policies "effectuate a denial of basic fairness for the male student population, because they are set up to encourage and facilitate false reports of sexual misconduct and/or other grievances without any recourse for the falsely accused." (Doc. 1, at 17). Lastly, Li submits that "[o]nly an anti-male bias to find for the female complainant against the male respondent can explain [the University's] purported refusal to enforce or even consider its own policy jurisdictional limitations against male students only." (Doc. 1, at 18). The Court finds that these allegations, taken alone or together, do not support a plausible inference of sex discrimination.

The University submits that "[i]t belies credibility to suggest that it is plausible that a student who has admitted that he engaged in criminal sexual contact with a minor was disciplined because of his gender instead of because he engaged in criminal conduct." (Doc. 9, at 22). The University's Policy prohibits both its male and female students from engaging in sexual misconduct, including off campus, "where the conduct has the potential to adversely affect any member of the University of Scranton community." (Doc. 2-4, at 8). Li's conclusory allegations fail to submit evidence to support his assertion that there is a higher incidence of

female complainants of sexual misconduct as compared to male complainants and the University's decision to discipline Li under the Policy. Even assuming accepting as true Li's contention that the University's Policy and implementation of its procedures "disproportionately affect the male population," this does not establish evidence of sex-based discrimination in the disciplinary process. (Doc. 1, at 17). A court cannot plausibly infer that a higher rate of sexual assaults committed by men against women, or complaints filed by women against men, indicates discriminatory treatment of males accused of sexual assault. *See Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984, 991 (D. Minn. 2017); *see also Doe v. Cummins*, 662 Fed. App'x 437, 453-54 (6th Cir. 2016).

Additionally, Li avers that the University subjected him to a disciplinary procedure and sanction even though the Policy does not apply to the misconduct in which he engaged. (Doc. 1, at 12). However, the Court finds that the complaint does not establish non-conclusory facts that support a plausible inference that the University's actions during or after the investigatory period had a nexus to the fact that Li is male. *See Doe v. Univ. of Delaware*, No. 19-1963, 2020 WL 6060476, at *5 (D. Del. Oct. 14, 2020). Li argues that the University "conducted its investigation of the allegations against [Li] in a manner that was slanted in favor of the female accusers so much so that an actual complaint was not needed in the process." (Doc. 1, at 17). Further, Li submits that "[o]nly an anti-male bias to find for the female complainant against the male respondent can explain [the University's] purported refusal to enforce or even consider its own policy jurisdictional limitations against male students only." (Doc. 1, at 18). The University asserts that Li fails to offer any factual allegations to support his assertion that there is a higher incidence of female complainants of sexual misconduct as compared to male complainants and the University's decision to

16

discipline Li under the Policy. (Doc. 9, at 22). Specifically, the University states that "[i]t belies credibility to suggest that it is plausible that a student who has *admitted* that he engaged in criminal sexual contact with a minor was disciplined because of his gender instead of because he engaged in criminal conduct." (Doc. 9, at 22).

Li does not establish evidence to support his allegation that the University's investigatory process was biased or gender-motivated. *See Doe v. Columbia Univ.*, 831 F.3d 46, 57 (2d Cir. 2016) (noting that allegations of a shoddy investigation may "support the inference of bias," but that such allegations "do not necessarily relate to bias on account of sex"). Neither does Li establish that the Investigator and Determination Panel were motivated by gender bias. *Cf. Columbia Univ.*, 831 F.3d at 58 (inference of gender bias permitted where allegedly biased individual "had significant influence, perhaps even determinative influence, over the University's decision"). At most, the University was notified that criminal charges were filed against Li for engaging in criminal sexual misconduct and followed the Title IX policy procedure. Even assuming the Determination Panel's judgment may suffer from some bias, Li has not offered facts showing that possible bias impacted the University's investigation.

Li's allegations in the complaint taken together do not support a plausible inference of sex discrimination. The University's Title IX procedures do not suggest that any existing policies discriminate against men or reward reports against men more than reports against women. While some courts have properly pointed to internal or external pressure when evaluating gender bias, those cases all contained indicia of specific intent to punish male students. *See, e.g., Univ. of the Scis.*, 961 F.3d at 210 (gender bias plausibly alleged where the school, "encouraged by federal officials, ha[d] instituted solutions to sexual violence against

17

women that abrogate the civil rights of men and treat men differently than women"); *Menaker v. Hofstra Univ.*, 935 F.3d 20, 27 (2d Cir. 2019) (gender bias plausibly alleged where, among other things, the school "faced internal criticism for its assertedly inadequate response to male sexual misconduct on campus" (emphasis added)); *Doe v. Purdue Univ.*, 928 F.3d 652, 669 (7th Cir. 2019) (gender bias plausibly alleged where, among other facts, school-affiliated group shared an article titled "Alcohol isn't the cause of campus sexual assault. Men are."); *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018) (gender bias plausibly alleged where, for example, "news media consistently highlighted the university's poor response to female complainants" (emphasis added)); *Doe v. Miami Univ.,* 882 F.3d 579, 594 (6th Cir. 2018) (gender bias plausibly alleged where school was being sued by a female student for failing to expel her alleged attacker).

Accordingly, as Li does not point to evidence of similarly slated conduct by the University, the Court will dismiss Li's Title IX claim.

IV.   **LEAVE TO FILE A SECOND AMENDED COMPLAINT**

The Third Circuit has instructed that if a complaint is vulnerable to a 12(b)(6) dismissal, the district court must permit a curative amendment unless an amendment would be inequitable or futile. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008). However, the Third Circuit has also acknowledged that a district court has "substantial leeway in deciding whether to grant leave to amend." *Lake v. Arnold*, 232 F.3d 360, 373 (3d Cir. 2000).

The Court will grant Li leave to file an amended complaint that is complete in all aspects, remedies the deficiencies identified above in his Title IX claim, and sets forth factual allegations and specific legal claims in a manner that can be answered by the University. Li is advised that the amended complaint must be a pleading that stands by itself without

reference to the original complaint. *See Young v. Keohane*, 809 F. Supp. 1185, 1198 (M.D. Pa. 1992). Any previously-asserted arguments or factual allegations that Li omits from his amended complaint will be deemed waived, including Li's breach of contract claim.

V.    CONCLUSION

For the foregoing reasons, the University's motion to dismiss for failure to state a claim (Doc. 8) is **GRANTED IN PART** and **DENIED IN PART**, and Count II of the complaint (Doc. 1) is dismissed without prejudice. Li is granted leave to file an amended complaint within thirty (30) days of this Memorandum, on or before **January 31, 2022**.

An appropriate Order follows.

                                        **BY THE COURT:**

**Dated: December 31, 2021**           *s/ Karoline Mehalchick*
                                        **KAROLINE MEHALCHICK**
                                        **Chief United States Magistrate Judge**

19